J-S69012-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ADRIAN ALLEYNE | |
| Appellant | No. 540 EDA 2015 |

Appeal from the Judgment of Sentence January 15, 2015
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0000906-2014

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., and OLSON, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED DECEMBER 07, 2015**

Appellant, Adrian Alleyne, appeals from the judgment of sentence entered in the Montgomery County Court of Common Pleas, following his bench trial convictions for false alarms to agencies of public safety, stalking, harassment, and disorderly conduct.[1]  We affirm.

In its opinion, the trial court fully sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.  We add only that Appellant timely filed a post-sentence motion on January 22, 2015, which the court denied on January 27, 2015.  Appellant timely filed a notice of appeal on February 24, 2015.  On February 26, 2015,

_____

[1] 18 Pa.C.S.A. §§ 4905(a); 2709.1(a)(1); 2709(a)(7); 5503(a)(4), respectively.

the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b), which Appellant timely filed on March 10, 2015.

Appellant raises two issues for our review:

WHETHER THERE WAS LEGALLY SUFFICIENT EVIDENCE TO SUPPORT [APPELLANT'S] CONVICTIONS FOR THE OFFENSES OF STALKING, IN VIOLATION OF 18 PA.C.S. § 2709.1(A)(1) AND FALSE ALARM[S] TO AGENCY OF PUBLIC SAFETY, IN VIOLATION OF 18 PA.C.S. § 4905(A).

WHETHER THE LEARNED TRIAL COURT ABUSED ITS DISCRETION WHEN IT IMPOSED AN AGGREGATE SENTENCE OF 4-10 YEARS WITH RESPECT TO APPELLANT'S CONVICTIONS FOR STALKING AND FALSE ALARMS.

(Appellant's Brief at 9).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable William R. Carpenter, we conclude Appellant's issues merit no relief. The trial court's opinion comprehensively discusses and properly disposes of the questions presented. (*See* Trial Court Opinion, filed June 1, 2015, at 6-16) (finding: **(1)** regarding stalking conviction, Appellant engaged in course of conduct that caused Victim fear on November 15, 2013; Appellant falsely reported 911 fire occurring at Laurel House women's shelter where Victim resided with her sons; evidence showed Appellant called Victim numerous times from pay phone outside Norristown public library, near Laurel House; Appellant made ominous statements such as, "Don't make me do this";

- 2 -

Victim saw Appellant standing outside of Laurel House that day; Appellant sent third party to Laurel House asking for Victim on Appellant's behalf; events of November 15, 2013 caused Victim significant stress; Victim was scared and afraid when she saw Appellant outside of Laurel House; Victim's counselor at Laurel House corroborated Victim's testimony, where counselor testified about efforts taken to calm down Victim; even without consideration of Victim's testimony concerning Appellant's alleged prior acts involving Victim and Victim's family, Commonwealth presented sufficient evidence to sustain Appellant's stalking conviction based solely on Appellant's actions on November 15, 2013; regarding false alarms conviction, circumstantial evidence showed Appellant made 911 false report of fire at Laurel House; phone call came from pay phone outside Norristown public library, in vicinity where officer saw Appellant lingering; Victim also saw Appellant outside Laurel House during relevant timeframe; multiple calls to Victim's cell phone that day came from same pay phone outside of library; lack of direct evidence did not defeat Commonwealth's case; circumstantial evidence, was sufficient to sustain Appellant's conviction for false alarms to agencies of public safety; **(2)** Victim and Victim's mother testified at sentencing regarding impact Appellant's crimes had on each of them; director of housing and operations at Laurel House also testified as to impact Appellant's actions had on Laurel House residents; Appellant presented various witnesses at sentencing and four character letters; Appellant's post-

sentence motion failed to preserve Appellant's claim on appeal that court did not state adequate reasons on record for sentencing, so it is waived;[2] moreover, court gave sufficient reasons on record for sentence imposed, where court indicated it had benefit of pre-sentence investigation report and reviewed victim impact statements, arguments of counsel, Appellant's statements, Sentencing Code and applicable guidelines, Appellant's criminal history, Appellant's prior employment history, and seriousness of current offenses; court considered all relevant factors upon sentencing). Accordingly, we affirm on the basis of the trial court's opinion.

> Judgment of sentence affirmed.
> President Judge Emeritus Ford Elliott joins this memorandum.
> Judge Olson concurs in the result.

_____

[2] On appeal, Appellant argues the court departed from the guidelines by imposing a sentence of 2½-5 years' imprisonment for Appellant's false alarms conviction. The certified record does not contain the sentencing sheet. Nevertheless, the court's remarks at sentencing seem to belie Appellant's contention, where the court expressly stated it intended a term of 2½-5 years' imprisonment for Appellant's stalking conviction and a consecutive term of 1½-5 years' imprisonment for the false alarms conviction. The parties agreed at sentencing that the standard range for the stalking offense was 21-30 months' imprisonment and the standard range for the false alarms offense was 12-18 months' imprisonment. Thus, the trial court intended to impose high-end standard range sentences for both offenses. The confusion appears to stem from a possible typographical error that appears on the copy of the sentencing sheet, which is in Appellant's supplemental brief and dictates a sentence of 2½-5 years' imprisonment for Count 1 and a sentence of 1½-5 years' imprisonment for Count 2. According to the criminal complaint, Count 1 is the false alarms offense and Count 2 is the stalking offense. The record otherwise indicates the court's intent to impose the greater sentence for stalking (Count 2). Therefore, we direct the trial court to correct any error in the sentencing sheet and to file a corrected version to be made a part of the certified record.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/7/2015

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY
PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  :       CP-46-CR-0000906-2014

           V.              :

ADRIAN ALLEYNE            :        540 EDA 2015

## OPINION

**CARPENTER J.**              **MAY 29, 2015**

FACTUAL AND PROCEDURAL HISTORY

Appellant, Adrian Alleyne, appeals from the judgment of sentence imposed on January 15, 2015, following his conviction at a non-jury trial of false alarm to agency of public safety[1], stalking[2], harassment[3] and disorderly conduct[4].

The trial was held on October 31, 2014, at which the following facts were established. The Commonwealth first called Officer Angela Anderson of the Norristown Police Department to testify. (Trial by Judge 10/31/14 p. 9). She testified that on November 15, 2013, she was dispatched to the 900 block of Swede Street for a report of a fire and smoke coming from a women's shelter, Laurel House. Id. At 9 – 10. When she and Officer Brain Graham arrived on the

---

[1]    18 Pa.C.S.A. 4905(a).

[2]    18 Pa.C.S.A. 2709.1(a)(1).

[3]    18 Pa.C.S.A. 2709(a)(7).

[4]    18 Pa.C.S.A. 5503(a)(4).

scene they did not observe any smoke or fire at that location. Id. at 10. Both officers entered Laurel House and confirmed that there was no fire in the building. Id. 10 - 11. Officer Graham had given Officer Anderson information regarding the individual who may have been responsible for the call. Id. at 11. That information led the officer to the area of the Norristown Public Library looking for Appellant. Id. at 12 - 13. At that location, Officer Anderson observed a male fitting the description that was given to her. Id. at 13. He was sitting on the front step of one of the residences next to the library. Id. at 13 - 14. After the officer pulled up a photograph of Appellant on J-Net, she confirmed that that male was in fact Appellant. Id. at 14 - 15. At that point, Officer Anderson got out of her vehicle to speak to Appellant. Id. at 16. During the ensuing conversation, Appellant at some point stated that he was nowhere near Jennifer Stallings. Id. at 16. Appellant conveyed his understanding that there was a PFA that was in place between him and Ms. Stallings. Id. at 17. Finally, Officer Anderson testified that there was a pay phone in front of the Norristown Public Library and that Appellant was near this pay phone. Id. The phone number associated with the pay phone is 610-275-9969. Id. at 39.

Next to testify was Ms. Stallings, the victim. Ms. Stalling described Appellant as an ex-boyfriend that she dated briefly prior to the time of the November 15, 2013, incident. Id. at 42. On November 15, 2013, Ms. Stallings was living at Laurel House with her two sons. Id. Around noon on that date, Ms. Stallings was getting ready to speak to her counselor when she received a phone call on her cell phone. Id. at 44. On the other end, a voice said, "Don't

2

make me do this. Don't make me do this." Id. This scared Ms. Stallings and she hung up. Id. Ms. Stallings called back the phone number that had just called her, and she recognized it to be a pay phone because it rang and rang and then she heard a buzzing sound. Id. Ms. Stallings testified that Appellant knew her then phone number. Id. at 45. Although Ms. Stallings didn't identify anyone by the voice on the phone call, she had a suspicion of who it might be. Id. at 47. She received several phone calls between 12:12 and 12:16. Id. at 48; see also, cell phone call log at Exhibit "C-4". At that time, Ms. Stallings was getting ready to see her counselor Miss Carolyn. Id. at 49. During her meeting with her counselor, Ms. Stallings happened to look out the window and she saw Appellant pacing back and forth outside. Id. at 49, 50. Immediately after, Ms. Stallings reported hearing cop sirens and fire truck sirens come roaring down the street. Id. at 49. MS. Stallings reported that seeing Appellant caused her fear and anxiety. Id. at 51, 52. Ms. Stalling further testified that after the firetrucks left, there was a knock on the door by a guy asking for Jennifer from Norristown. Id. at 52. She was afraid. Id. Ms. Stallings spoke to the police, and in the course of that conversation she told them she had seen Appellant and she gave them a description of him. Id. at 55. Later that night, Ms. Stallings and her children had to relocate to a different shelter due to safety reasons. Id. at 56.

Ms. Stallings was questioned about where she had been living prior to arriving at Laurel House. Id. Ms. Stallings testified that she had been living in West Philadelphia on Edgewood Street with her parents and her sons. Id. That is where she had lived during the course of her three month relationship with

3

Appellant. Id. at 57. At some point after the relationship ended, Ms. Stallings sought out a protection from abuse order ("PFA") against Appellant. The temporary PFA order was issued on September 19, 2013. Id. at 57 – 58. The following day, Appellant sought a temporary PFA order against her. Id. at 59. On September 23, 2013, a final hearing was held on both PFA orders. Id. at 60. In an effort to avoid a drawn out procedure, Ms. Stallings agreed for a final PFA order to be entered against her. Id. at 60 – 61. A PFA order was also issued against Appellant. Id. at 62.

Ms. Stallings described the events that led up to the entry of the PFA orders. She testified that the "last straw" happened after the relationship ended when she saw Appellant standing on the corner of her block for a few previous days, and at one point Appellant threw glass bottles at her. Id. at 62 – 63. Even after the entry of the PFA order Ms. Stallings believed that Appellant was causing problems for her online. Id. at 63 – 64. Ms. Stalling also stated that she was having problems with phone calls. Id. at 66. There was also an incident at her parent's home in which Ms. Stallings was at home with her mom, her children and one other friend where someone was trying to break in through the windows at about 5:00 p.m. Id. at 66. This incident made everyone was scared and nervous. Id. Ms. Stallings immediately ran out of the house and grabbed the boys. Id. Ms. Stallings further related how random people would come and knock on her door and say something like, "this guy asked me to come up and get you." Id. at 67 - 68.

4

The Commonwealth also called Carolyn Coleman, a counselor advocate and legal advocate employed at Laurel House, to testify. Id. at 83. She testified that on November 15, 2013, she was meeting with Ms. Stallings at the Laurel House in her office. Id. During their meeting, the witness testified that Ms. Stallings called out "Miss Carol, Miss Carol, it's him, it's him!" Id. at 84. Ms. Stallings identified the person as Appellant. Id. Ms. Coleman stated that Ms. Stallings was very scared and terrified. Id. at 84, 86. Another co-worker had to be called in to help calm Ms. Stallings down. Id. at 84. In the meantime, Ms. Coleman received a call asking whether there was fire in the shelter. Ms. Coleman reported that this upset Ms. Stallings again. Id. at 84 – 85. Ms. Coleman also relayed the same story that during the events of November 15, 2013, someone had come to the door asking for Jennifer. Id. at 89. This unknown person also stated that there was someone who wanted to talk to her down the street and he was just relaying a message. Id. at 89 – 90. Ms. Coleman stepped out and looked up the street. She saw someone sitting on the church steps. Ms. Coleman identified that person as Appellant. Id. at 90.

Appellant did testify on his own behalf. The Commonwealth then presented two rebuttal witnesses. At the conclusion of the trial, Appellant was found guilty of the aforementioned charges.

On January 15, 2015, Appellant was sentenced to an aggregate term of 4 to 10 years' imprisonment.

A timely post-sentence motion was filed on January 22, 2015, and was denied. This timely appeal followed.

5

## ISSUES

I.    Whether there was sufficient evidence to support Appellant's stalking conviction.

II.   Whether there was sufficient evidence to support Appellant's conviction for false alarm to agency of public safety.

III.  Whether this Court imposed a proper sentence.

## DISCUSSION

I.    There was sufficient evidence to support Appellant's stalking conviction.

First on appeal, Appellant contends that the evidence was insufficient to convict him of stalking under 18 Pa.C.S.A. §2709.1(a)(1).

The standard our Superior Court applies in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, the our Superior Court may not weigh the evidence and substitute its judgment for the fact-finder. In addition, the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.

6

Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. Commonwealth v. Abed, 989 A.2d 23, 26 -27 (Pa.Super. 2010) (citing Commonwealth v. Hutchinson, 947 A.2d 800, 805-806 (Pa.Super. 2008)) (emphasis in original)

To convict a defendant of stalking under 18 Pa.C.S.A. §2709.1(a)(1), the following must be proved.

### § 2709.1. Stalking

(a) **Offense defined.**--A person commits the crime of stalking when the person either:

(1) engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances which demonstrate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person;

18 Pa.C.S.A. § 2709.1.

The statute further defines the term "course of conduct" as:

A pattern of actions composed of more than one act over a period of time, however short, evidencing a continuity of conduct. The term includes lewd, lascivious, threatening or obscene words, language, drawings, caricatures or actions, either in person or anonymously. Acts indicating a course of conduct which occur in more than one jurisdiction may be used by any other jurisdiction in which an act occurred as evidence of a continuing pattern of conduct or a course of conduct.

7

18 Pa.C.S.A. § 2709.1(f).

In this case, the Commonwealth circumstantially proved that Appellant engaged in a course of conduct that caused Ms. Stalling fear on November 15, 2013. First, Appellant called in a fake fire alarm to 911 on November 15, 2013, stating that there was a fire in the woman's shelter, Laurel House, where Ms. Stallings was residing at that time with her sons. In addition, the circumstantial evidence showed that he was calling her cell phone numerous times from the pay phone outside of the Norristown Public Library. He made ominous statements such as "Don't make me do this." In addition, Appellant was actually standing outside of the shelter and was seen by Ms. Stallings and he even sent in a third party to women's shelter asking for her on Appellant's behalf.

On appeal, Appellant specifically argues that the Commonwealth's evidence did not establish a course of conduct that demonstrated an intent to place Ms. Stallings in fear of bodily injury or cause her any substantial stress. However, Ms. Stallings and Ms. Coleman's testimony was sufficient to establish that Appellant's course of conduct did in fact cause her substantial stress. In addition, the events of November 15, 2013, caused Ms. Stallings significant stress. Ms. Stallings testified that she was scared and afraid when she saw Appellant outside of the woman's shelter. That testimony was corroborated by Ms. Coleman's testimony regarding the efforts that were taken to calm Ms. Stallings down.

8

Next on appeal, Appellant argues that the evidence was insufficient that it was him who allegedly had broken into the home Ms. Stallings' parents, which allegedly caused her to seek shelter at Laurel house. However, even without taking Ms. Stallings testimony in this regard into consideration, there was sufficient evidence as Appellant actions on November 15, 2013, were sufficient to prove "course of conduct".

Appellant's third argument states that there was insufficient evidence because there was no evidence that it was him that made the numerous phone calls to Ms. Stallings to her at her parent's home when she resided there or to her at Laurel House.

There was more than sufficient evidence that it was Appellant who made numerous phone calls to Ms. Stallings while she was at the Laurel House on November 15, 2013, in that the circumstantial evidence showed that Appellant was in the proximity to the pay phone outside of the Norristown Public Library as testified to by Ms. Stallings, Ms. Coleman and Officer Anderson. Additionally, the evidence showed that the numerous phone calls to Ms. Stallings' phone that day came from that pay phone. This is more than sufficient evidence. Appellant's stalking conviction can be upheld regardless of whether or not Appellant made additional phone calls to Ms. Stallings at her parents' house.

Lastly, Appellant believes the evidence was insufficient because there were some acts of harassment and illegal behavior involving the home of Ms. Stallings' parents, there was no evidence linking him to those acts and the

9

only link between him and those acts was the conjecture and supposition of Ms. Stallings and her family. Despite this, there was more than sufficient evidence to convict Appellant of stalking based solely on his actions on November 15, 2013.

II. There was sufficient evidence to support Appellant's conviction for false alarm to agency of public safety.

Next on appeal, Appellant challenges the sufficiency of the evidence in support of his conviction for false alarm to agency of public safety.

To prove a defendant guilty of false alarm to agency of public safety, the Commonwealth must establish beyond a reasonable doubt as follows:

### § 4905. False alarms to agencies of public safety

(a) **Offense defined.**--A person commits an offense if he knowingly causes a false alarm of fire or other emergency to be transmitted to or within any organization, official or volunteer, for dealing with emergencies involving danger to life or property.

18 Pa.C.S.A. §4905.

In this case, the circumstantial evidence showed that Appellant was the person who made the 911 call to falsely report a fire at Laurel House. The phone call to 911 came from the phone number 610-275-9969, to which it was stipulated that that phone number is from the pay phone outside the Norristown Public Library. (Trial by Judge 10/31/14 pp. 38 - 39). Additionally, Appellant was found lingering by the Norristown Public Library, in the vicinity of the pay phone by Officer Anderson. He had also been seen by Ms. Stallings

10

and Ms. Coleman outside the shelter during the operative time period. Finally, it was the same phone that was used to make calls to Ms. Stallings cell phone while she was in Laurel House.

Appellant specifically argues that the evidence was insufficient because there was absolutely no evidence presented by the Commonwealth to link him to the false alarm call made from the public pay phone outside the Norristown Public Library in that the voice on the 911 call was not identified as his, no one testified that they observed him using the public pay phone outside of the library at or near the time of the false alarm call was made, his fingerprints were not found on the pay phone and that his DNA was not found on the pay phone. However, the Commonwealth may prove its case through wholly circumstantial evidence, which it did, and the lack of direct evidence does not defeat the Commonwealth's circumstantial evidence.

III.     This Court imposed a proper sentence.

Finally, Appellant asserts that this Court abused its discretion when it imposed an aggregate sentence of 4 to 10 years' of total confinement with respect to his convictions from stalking and false alarm to an agency of public safety, arguing that this Court failed to state sufficient reasons for imposed a minimum sentence of twice the top of the standard range of the Sentencing Guidelines with respect to the false alarm conviction.

Sentencing was held on January 15, 2015. The Commonwealth called Ms. Stallings and Ms. Stalling's mother, Brenda Stallings, to testify to the impact the crimes had on each of them. (Sentencing 1/15/15 pp. 3 - 18). Next

11

to testify on behalf of the Commonwealth was Jennifer Boyer, the Senior Director of Housing and Operations for Laurel House. Id. at 19. Ms. Boyer testified as to the impact that Appellant's crimes had on other women at Laurel House.

Appellant also presented several witnesses. First to testify was Leon Roberts, a family friend and neighbor, Beverly Alleyne, Appellant's aunt, Alfonso Evans, Appellant's stepfather and Marcia Alleyne, Appellant's mother. In addition, Appellant presented four character letters. A motion for extraordinary relief was made, but denied. Id. at 35 - 36. Appellant exercised his right to allocution. Id. at 38 - 39.

The following sentence was imposed. On the stalking conviction, Appellant was sentenced to 2 ½ to 5 years' imprisonment. On the false alarm to an agency of public safety, Appellant was sentence to a term of 1 ½ to 5 years consecutive to his stalking sentence. Harassment merged and on Appellant's disorderly conduct offense, Appellant was sentenced to a term of 6 to 12 months', to run from the date of sentencing. The aggregate sentence imposed was 4 to 10 years'. Id. at 50 - 51.

The present issue, i.e., inadequate reasons stated on the record for a court's sentencing a defendant in the aggravated range of the Sentencing Guidelines, goes to the discretionary aspects of sentencing, for which there is no automatic right to appeal. Commonwealth v. Antidormi, 84 A.3d 736, 759 (Pa.Super. 2014).

12

To adequately preserve a discretionary sentencing claim, the defendant must present the issue in either a post-sentence motion, or raise the claim during the sentencing proceedings. Commonwealth v. Zeigler, 112 A.3d 656, 661 (Pa.Super. 2015) (citing Commonwealth v. Cartrette, 83 A.3d 1030, 1042 (Pa.Super. 2013) (*en banc*)). In this case, Appellant's trial counsel did file a timely post-sentence motion; however, she did not raise this particular issue; therefore, it is waived.

Assuming *arguendo* that this issue was properly preserved, it does present a substantial question. Our Superior Court had held that claims that the sentencing court imposed a sentence outside the standard guidelines without stating adequate reasons on the record presents a substantial question. See, Commonwealth v. Robinson, 931 A.2d 15, 26 (Pa.Super. 2007).

Our appellate court's standard of review of a challenge to the discretionary aspects of sentence is well-settled:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

Antidormi, 84 A.3d 736, 760 (Pa.Super. 2014) (citing Robinson, supra.

Factors to be considered when determining a defendant's sentence include the character of the defendant and the particular circumstances of the offense in light of the legislative guidelines for sentencing. Commonwealth v.

13

Scott, 860 A.2d 1029, 1032 (Pa.Super. 2004). The sentence imposed must be consistent with the protection of the public, the gravity of the offense and the rehabilitative needs of the defendant. Id. "Where pre-sentence reports exist, we shall ... presume that the sentencing judge was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors. A pre-sentence report constitutes the record and speaks for itself." Commonwealth v. Devers, 519 Pa. 88, 546 A.2d 12, 18 (1988). Further, "[h]aving been fully informed by the presentence report, the sentencing court's discretion should not be disturbed." Id.; see also, Commonwealth v. Egan, 679 A.2d 237, 239 (Pa.Super. 1996) (The court is required to place its reasons for the sentence on the record and this requirement can be satisfied by indicating it has reviewed a pre-sentence report).

This Court stated sufficient reasons for the sentence imposed as follows.

> All right then, the Court does have the benefit of the presentence investigation and report, which I have carefully considered. I have also prior to today's proceeding received the letters that have been referred to an the victim impact statement. I, of course, considered all the information supplied today by counsel and the arguments of counsel and the statements of the defendant. It is true I have also considered, I should say, the Sentencing Code and the sentencing guidelines.
>
> I'll admit it is true that the defendant does enjoy the support of family and friends. He still has their love and support, notwithstanding his criminal history, which is significant.

14

The criminal history I will refer to, because he has previously been committed to the state prison system and he has been convicted of a number of crimes of violence.

In 1995 we start with a kidnapping, felony one, very serious crime. Sentenced two to ten years in the state prison system on September 18, 1996. In 1996 he pled guilty to harassment. Then in 1996 there was the criminal attempt at rape and the intimidation of witness or victim, both felonies of the third degree. The information is he pled guilty to both charges on September 18, 1996, and was sentenced to three to ten years on the charge of criminal attempt at rape and two to five years on the other matter. Then there was a robbery also, a two to five year sentence on the same date.

He later had an aggravated assault in 2002; a three to ten year state prison sentence on the aggravated assault. There also was a possessing instrument of crime, two and-a-half to five years. Then we come to the instant offense.

The presentence investigation and report does set forth his social history, his family history, his education, occupation. He has been incarcerated for many years, by he has worked at times doing asbestos removal when last released from prison. He was employed as a transporter for a year and-a-half. He worked as a cook, He's also worked in construction.

The presentence investigation and report does note that he has a history of domestic altercations with females resulting in felony convictions.

This man does pose a clear and present danger to law-abiding citizens. The facts here are very disturbing, the intrusion into the safe haven of Laurel House, a women's shelter. His conduct has had a very large and negative impact on the victim, the community, the workers, employees and staff of Laurel House and the other people there.

15

It has to be underscored that a false fire alarm poses a significant danger to the public and the responding First Alarmers, certainly to the people at the location involved. That is quite obvious. The fire alarm people travel at a high rate of speed in order to try to put out what they believe to be a real fire; of course, here it's a false alarm. Conduct of this type cannot be tolerated.

Clearly, a consecutive state prison sentence is appropriate given his character and attitude and his very high risk of reoffending. Simply stated, he is a dangerous person. We know that state prison sentences in the past has not deterred him from criminal conduct, and they span a period of time. His crimes are distinct evil deeds, factually related but having separate harmful serious impacts.

I believe the sentence that I impose is appropriate to protect abused women in shelters, employees at those shelters, staff, the public and First Responders

(Sentencing 1/15/15 pp. 47 – 50). The record reflects that this Court did

consider all of the relevant factors. Accordingly, Appellant's sentence is proper.

### CONCLUSION

Based on the forgoing analysis, the judgment of sentence imposed

on January 15, 2015, should be affirmed.

BY THE COURT:

WILLIAM R. CARPENTER        J.
COURT OF COMMON PLEAS
MONTGOMERY COUNTY
PENNSYLVANIA
38TH JUDICIAL DISTRICT

16

**Copies sent on May 29, 2015**
**By Interoffice Mail to:**
District Attorney

**By First Class Mail to:**
Raymond Roberts, Assistant Public Defender